✓ FILED ___ ENTERED
___ LOGGED ___ RECEIVED

10:27 am, Apr 20 2022
AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___TTS___ Deputy

KOH
JJI/JB: USAO 2021R00496

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | * | Case No.   22-mj-1199-TJS |
| | * | |
| **SHEIKH BASSIROU KANTE,** | * | |
| a/k/a "Bass Kante," | * | |
| a/k/a "Ibraham Dambeley," | * | **Filed Under Seal** |
| | * | |
| **Defendant** | * | |

\*\*\*\*\*\*\*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Special Agent Jason J. Scalzo, Federal Deposit Insurance Corporation – Office of Inspector General ("FDIC-OIG"), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7)—that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516. Specifically, I am a Special Agent with FDIC-OIG, and have been so employed since December 2020. Previously, I was a Special Agent with the Department of Health and Human Services – Office of Inspector General ("HHS-OIG") from February 2010 to January 2018, and the Treasury Special Inspector General for the Troubled Asset Relief Program from September 2019 to December 2020.

2. I am assigned to FDIC-OIG's Electronic Crimes Unit, where I investigate computer-related crimes such as computer intrusions, business email compromises, ransomware and internet fraud. Additionally, I am a Task Force Officer with the Federal Bureau of Investigation ("FBI") and am currently a member of the Cyber Task Force. I have personally

1

conducted a variety of computer-related investigations, which have included the use of subpoenas, search warrants, and computer forensic exams. I have also participated in numerous other criminal investigations involving, among other things, identity theft, mail fraud, wire fraud, money laundering, child exploitation, and insider trading.

3. Through my training and experience, I have become familiar with financial and computer crimes, the behavior of persons engaged in such offenses, and the use of investigative techniques to uncover evidence, fruits, and instrumentalities of these offenses. Among other techniques, I have participated in the execution of search warrants and other legal process, including warrants for both physical and electronic evidence. I have also interviewed subjects and victims of, and witnesses to, these offenses.

4. I submit this affidavit in support of a criminal complaint and arrest warrant. Based on my training and experience, and the facts set forth in this affidavit, I submit there is probable cause to believe that, between at least in or about August 2020 and in or about September 2021, **SHEIKH BASSIROU KANTE, a/k/a "Bass KANTE," a/k/a "Ibraham Dambeley,"** ("**KANTE**") has violated 18 U.S.C. § 1956(h) (money laundering conspiracy) (the "TARGET OFFENSE").

5. The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and individuals. Because this affidavit is intended to show only that there is probable cause for the requested warrant, it does not set forth all of my knowledge about the underlying investigation. I have not, however, excluded any information known to me that would defeat a determination of probable cause.

## **PROBABLE CAUSE**

6.  Since April 16, 2021, the United States, including FDIC-OIG, Department of Treasury Office of Inspector General ("TIG"), FBI, HHS-OIG, and Homeland Security Investigations ("HSI"), has been investigating **KANTE** and others in connection with suspected computer intrusions and BEC schemes involving two victim companies.

7.  BEC schemes often involve a perpetrator gaining unauthorized access to a business email account, blocking or redirecting communications to and/or from that email account, and then using the compromised email account or a separate fraudulent email account (sometimes called a "spoofed" email account) to engage in further communications designed to cause victims unintentionally to redirect wire transfers to accounts controlled by the perpetrator.[1]  The perpetrator will frequently direct the victim to wire funds to the bank account of a third party (sometimes referred to as a "money mule"), who will then send the funds to the perpetrator or other individuals working with the perpetrator.[2]

8.  In this case, investigators believe that the perpetrator(s) of the scheme described below compromised login information for a company employee, which allowed the perpetrator(s) to change payment routing information, causing victim funds to be transmitted to the perpetrator(s)

---

[1] One way of spoofing an email address is to create an account at a fraudulent domain, where the domain name is altered to appear identical to a real company domain but is actually misspelled by a letter or character.  For example, a BEC perpetrator might spoof the email address of "John" at fictitious ACME, Inc. (john@acmecompany.com) by creating an email account at a fraudulent domain (*e.g.*, john@acmecornpany.com, with "rn" replacing the "m" in "company", or john@acmecompanies.com, changing the singular to plural).  Alternatively, perpetrators will create a fraudulent email account at a legitimate email provider (*e.g.*, johnacmecompany@yahoo.com).

[2] BEC schemes often rely on the use of "money mules," who are individuals who accept stolen funds into their legitimate bank accounts on behalf of co-conspirators.  BEC schemes can also use multiple money mules or other accounts to launder fraudulently obtained funds. The funds can then be laundered by wiring or transferring them through additional bank accounts, or by quickly withdrawing the funds as cash or via check or cashier's check.

rather than to the payee intended by the victim. **KANTE** was ultimately a recipient of funds stolen through the scheme to defraud both Company A and Company D, as described below.

### The BEC at Company A

9. One BEC fraud involving **KANTE** related to an intrusion at Company A, a healthcare company located in Washington State.

10. Through counsel, Company A relayed to investigators that, on or about December 31, 2020, Employee 1 reported that his wallet, work badge, and cell phone had been stolen from his vehicle. Then, on or about February 11, 2021, an unknown perpetrator contacted Company A's call center to attempt to reset Employee 1's password. Employee 1's account was then deactivated and reactivated several times. After several phone calls, the perpetrator succeeded in reactivating Employee 1's account and adding to Employee 1's account a "secondary" phone number that the perpetrator controlled. Although Company A used two-factor authentication to secure its employees' accounts, investigators believe that the perpetrator was able to obtain Employee 1's login information through controlling the secondary number.

11. On or about February 15, 2021, companies that were contracted to provide billing services to Company A began reporting to Company A's computer support personnel that there were multiple attempts to reset Employee 1's accounts on their platforms. Investigators believe that the perpetrator, through access to Employee 1's account, discovered invoices reflecting that payments were owed to Company A from Company B, a health insurance company located in Mountlake Terrace, Washington. Ultimately, the perpetrator gained access to a billing platform and changed the routing instructions for payments meant for Company A to a bank account held at Wells Fargo by a money mule, Individual 1.

The Initial Fraudulent Transfers to Individual 1

12. Unaware that the payment routing information had been altered, Company B paid the invoices that were payable to Company A by eight wire transfers totaling $7,913,629.00 to a Wells Fargo account ending in 5667 ("WF 5667"), an account controlled by Individual 1.[3] According to Company B, the payments diverted to WF 5667 were intended to cover open invoices at Company C, a healthcare company located in Anchorage, Alaska.

13. Bank records revealed that, of the amount payable to Company C, WF 5667 received three automated clearing house ("ACH") deposits on or about March 4, 2021, totaling $2,490,367.38.

14. On or about March 11, 2021, WF 5667 received two additional ACH transfers from Company B totaling $2,475,876.80 (increasing the amount of BEC proceeds in WF 5667 to $4,966,244.18).

15. On or about March 12, 2021, Individual 1 initiated three transfers totaling $2,489,173.28 from WF 5667 to a Wells Fargo account ending in 5626 ("WF 5626"), another account controlled by Individual 1 (reducing the amount of proceeds in WF 5667 to $2,477,070.90).

16. On or about March 15, 2021, Individual 1 made five transfers totaling $2,220,000.08 from WF 5626 to a Wells Fargo account ending in 8460 ("WF 8460"), yet another account controlled by Individual 1 (reducing the amount of proceeds in WF 5626 to $257,070.82).

---

[3] Each of the accounts controlled by Individual 1 described herein are held in various entity names with Individual 1 as signatory authority.

As discussed below, **KANTE** ultimately received a portion of the funds that Individual 1 transferred from WF 5626 to WF 8460.[4]

17.     Individual 1 subsequently filed an online complaint with TIG concerning the electronic transfer of the funds that had been diverted from Company B.  In an interview with federal agents, Individual 1 stated that, sometime in 2020, a business contact connected Individual 1 with Co-conspirator 1.  Co-Conspirator 1 told Individual 1 that Co-conspirator 1 was looking to raise capital for purchasing architectural products, including windows and paint, for a construction project.  Individual 1 stated that, through communications with Co-conspirator 1, Individual 1

---

[4] Also on or about March 15, 2021, Individual 1 made three transfers totaling $2,400,000 from WF 5667 to a Wells Fargo account ending in 9451 ("WF 9451"), an account controlled by Individual 1 (reducing the amount of BEC proceeds in WF 5667 to $77,070.90).

On or about March 16, 2021, Individual 1 transferred $250,000 from WF 9451 back to WF 5667; and then transferred $50,000 from WF 5667 to WF 5626 (with the net result of increasing the amount of proceeds in WF 5667 to $277,070.90; reducing the amount of proceeds in WF 9451 to $2,150,000; and increasing the amount of proceeds in WF 5626 to $307,070.82).

On or about March 18, 2021, WF 5667 received four additional ACH transfers from Company B totaling $2,947,384.82 (increasing the amount of proceeds in WF 5667 to $3,224,455.72; and bringing the total received by Individual 1 from Company B to $7,913,629.00). The same day, Individual 1 made four transfers totaling $2,947,187.27 from WF 5667 to WF 9451 (reducing the amount of BEC proceeds in WF 5667 to $277,268.45; and raising the amount of proceeds in WF 9451 to $5,097,187.27).

On or about March 22, 2021, Individual 1 transferred $170,000 from WF 9451 to WF 5667 (decreasing the amount of proceeds in WF 9451 to $4,927,187.27; and increasing the amount of proceeds in WF 5667 to $447,268.45).

On or about March 23, 2021, Wells Fargo determined that the eight ACH transfers from Company B to WF 5667 were fraudulent.  Accordingly, Wells Fargo transferred, through two transactions, $190,000 from WF 5626 to WF 5667; and transferred, through six transactions, $4,981,813.01 from WF 9451 to WF 5667.  (The net result was that WF 5667 contained $5,619,081.46 in BEC proceeds; WF 5626 contained $1,029,173.20 in BEC proceeds; and the net balance in WF 9451 was reduced by $54,625.74.)

Finally, on or about March 26, 2021, Wells Fargo transferred, through two ACH transactions, a total of approximately $4,964,879.79 back to Company B from accounts controlled by Individual 1.  Ultimately, however, $2,948,749.21 of the $7,913,629.00 that was originally stolen was not returned by Wells Fargo.

eventually agreed to participate in an "investment group" that aspired to raise at least $5 million for "environmentally friendly oil drilling projects."

18. Individual 1 provided agents copies of email files and text messages that he exchanged with Co-conspirator 1. Agents saw that, although Co-conspirator 1 initially claimed that he was seeking to arrange an investment opportunity, Co-conspirator 1 subsequently convinced Individual 1 to conduct the wire transfers referenced herein on the grounds that they were legitimate business transfers (even though they were not).

19. According to WhatsApp messages provided by Individual 1, on or about March 12, 2021, Co-conspirator 1 instructed Individual 1 to wire $945,000 to a Bank of America account ending in 2315 ("BA 2315"), an account held in the name of "Ravine's Logistic Inc.," with an account address at a residence in Beltsville, Maryland (hereafter, the "BELTSVILLE PREMISES"). Later on March 12, 2021, Co-conspirator 1 wrote to Individual 1, "The fund [sic] you move will not be sufficient to execute all the payment therefore we have to short pay the Ravine's Logistic Inc so another invoice will be send to you as soon as possible and Ravine's Logistic previous invoice will be cancel [sic]."

20. Agents later executed a search warrant for the contents of multiple email accounts used by Co-conspirator 1 and **KANTE**. In one of the accounts (basskante1983@gmail.com), believed to be used by **KANTE** ("**KANTE**'s email account"), agents located an email dated March 12, 2021, that **KANTE** appeared to have sent to himself. Attached to the email was a document named "Ravine Gold Invoice.pdf," which purported to be an invoice issued to Individual 1. The invoice was for "21kg gold bars," described as "23-carat gold dore bars," with a unit price of $45,000 and total price of $945,000. The payment information on the invoice directed payment to BA 2315 at the BELTSVILLE PREMISES, and the invoice included a known phone number

ending in 8286 (the "8286 Phone Number"), which is the account phone number for two PayPal accounts known to agents to be used by **KANTE**. Individual 1 ultimately received a copy of the Ravine's Logistic invoice from Co-conspirator 1 that was identical to the one found in **KANTE**'s email account.[5]

### The Fraudulent Transfer from Individual 1 to KANTE

21. On or about March 16, 2021, Individual 1 wired $570,000.00 from WF 8460 to BA 2315, which—as mentioned above—was held in the name of "Ravine's Logistic" at the BELTSVILLE PREMISES.[6] Individual 1 told agents that he made this wire transfer to BA 2315 at the direction of Co-conspirator 1 and another unidentified person.[7]

22. A business named "Ravine's Logistic, Inc." was registered with the Maryland Department of Assessments and Taxation on August 13, 2020. On the registration for the business, which is no longer in good standing, the principal office was identified as a residence in Laurel, Maryland (hereinafter, the "LAUREL PREMISES"), and the resident agent was identified as "**Ibraham Dambeley**," at the BELTSVILLE PREMISES.[8]

---

[5] Thus far, agents have not located any evidence of communication between Co-conspirator 1 and **KANTE**. But the existence of this document, among other evidence, suggests that Co-conspirator 1 and **KANTE** are either working together or with the same mutual coconspirator(s).

[6] On or about March 15, 2021, Individual 1 wired $1,500,000.00 from WF 8460 to another Wells Fargo Bank account held in the name of a corporation located in Lucerne Valley, California.

[7] Individual 1, at Co-conspirator 1's direction, conducted the following additional transactions using the Company B funds in WF 8460: a $250,000 wire transfer from WF 5667 to a company in Linyi, China; a $50,000 cashier's check to a company in Las Vegas, Nevada; and a $100,000 cashier's check to yet another business entity. Agents later seized the $100,000 cashier's check from Individual 1 and returned the funds to Company B.

[8] Recently, on March 17, 2022, **KANTE** registered "Ravines Logist, Inc." with the Maryland Department of Assessments and Taxation. **KANTE** identified the resident agent as himself ("Sheikh Bassirou **KANTE**") at the LAUREL PREMISES and likewise identified the principal office as the LAUREL PREMISES.

8

23. According to bank records, BA 2315 was opened on or about August 27, 2020, and funded with two ATM deposits totaling $15,400. **Dambeley** was listed as the corporate President and the sole account signer. The account was opened at a Bank of America branch located in Rockville, Maryland.

24. Agents believe that **Dambeley** is a false identity created by **KANTE** to conceal his true name in connection with the illegal activity described herein. Among other reasons, the execution of the above-referenced search warrant on two additional email accounts associated with **KANTE**, eastern7ent@gmail.com and royalinternational6@gmailcom, revealed an email message dated on or about March 25, 2021, with a subject line "Heheh," and an attachment containing an image of a Nevada driver's license purportedly issued to "Ibraham **Dambeley**," but displaying a photo of **KANTE** instead. Agents later determined that this Nevada driver's license has never been issued and was, in fact, a false identification document with an issuance date of December 15, 2018, and expiration date February 1, 2023.

25. **KANTE** is also linked to **Dambeley** through other electronic evidence. In response to a court order, Google LLC produced a list of Google accounts linked by cookie with ibrahamdambeley@gmail.com—the email account registered to receive email notifications concerning wire transfers from BA 2315.[9] The accounts linked by cookie with the ibrahamdambeley@gmail.com account included Google accounts associated with the following email addresses: basskante1983@gmail.com; ccholopray1982@gmail.com; corporate@royallogginginc.com; eastern7ent@gmail.com; globalrecordsgre@gmail.com;

---

[9] In general, accounts are linked by cookies when they are accessed using the same device or devices.

info@royalgoldinc.com; royalinternational6@gmail.com; sbkfoodreliefproject@gmail.com sheikhbassiroukante@royalgoldinc.com; and sheikhentertainment@gmail.com.

26. As described below, records of expenditures from the BA 2315 account further support the conclusion that **Dambeley** is a false identity used by **KANTE**.

  a. On or about September 8, 2020, the BA 2315 account was used to write a check for "Rent" to **KANTE**'s landlord at the LAUREL PREMISES in the amount of $2,440.

  b. The BA 2315 account was used to make three subsequent payments to the landlord in or about October 2020, November 2020, and March 2021. The landlord subsequently provided agents with a leasing document dated on or about June 22, 2019, revealing that **KANTE** and **KANTE**'s former girlfriend were the residents of the LAUREL PREMISES. The landlord told agents that **KANTE** later removed the girlfriend from the lease and that the landlord believed that **KANTE** now resides alone at the LAUREL PREMISES.

  c. On or about February 25, 2020, **KANTE** registered a U.S. Postal Service ("USPS") Informed Delivery account at the LAUREL PREMISES. USPS's Informed Delivery service provides residential customers with a digital preview of incoming mail scheduled to arrive soon. As of the date of this affidavit, **KANTE**'s LAUREL PREMISES Informed Delivery account is still active.

  d. According to information obtained from USPS, **KANTE** has received mail at the LAUREL PREMISES as recently as on or about April 19, 2022.

  e. According to information obtained from USPS, **KANTE** also received mail at the BELTSVILLE PREMISES as recently as on or about May 15, 2021. The BELTSVILLE PREMISES also received mail addressed to **Dambeley** on or about March 3, 2021.

f. A review of records from the Maryland Department of Assessments and Taxation revealed that, since June 27, 2005, the BELTSVILLE PREMISES has been owned by **KANTE**'s mother. Accordingly, agents believe that the LAUREL PREMISES is **KANTE**'s primary residence and that the BELTSVILLE PREMISES is the primary residence of **KANTE**'s mother.

27. In addition to the above-described transactions, BA 2315 also was used to make three transfers in or about November 2020 to Individual 2 totaling $13,500. Agents believe that Individual 2 is a **KANTE** associate, insofar as a review of email accounts associated with **KANTE** revealed communications with Individual 2 regarding business dealings.

28. Additional BA 2315 account activity reflected cash or check deposits funding primarily personal expenses occurring in Maryland.

## **KANTE's** Use of the BEC Proceeds

29. As discussed above, on or about March 16, 2021, BA 2315 received the $570,000 transfer from Individual 1's account at Wells Fargo (WF 8460). **KANTE** (using his **Dambeley** alias) immediately began transferring these funds out of the account, as detailed below.

a. On or about March 16, 2021, the same day, **KANTE** transferred $150,000 from BA 2315 to an account held in the name "Royal Gold International" at Guaranty Trust Bank, a bank in Nigeria.[10] The wire transfer notes referenced "3 kilograms of gold". Also, on or about March 16, 2021, **KANTE** wired an additional $53,712 to an account held in the name of Ibraham **Dambeley** at Truist Bank. The wire transfer notes referenced "gold supply commission fees".

---

[10] In bank records, agents located a vehicle loan agreement dated March 19, 2021, in which **KANTE** indicated that his employer was "Royal Gold International."

11

  b. On or about March 18, 2021, **KANTE** transferred an additional $103,641.57 from BA 2315 to the above-referenced Royal Gold International account at Guaranty Trust Bank. The wire transfer notes referenced "2 kilograms of 23 kart gold b".

  c. On or about March 18, 2021, **KANTE** transferred $78,054 from BA 2315 to a JP Morgan Chase account ending in 0797 ("JPMC 0797") held in the name of "Global Records Entertainment Inc." The wire transfer notes referenced "Sounds and Lighting Equipment paid".

    i. "Global Records Entertainment Inc." was registered with the Maryland Department of Assessments and Taxation on May 8, 2018. Like "Ravine's Logistic," the principal office for Global Records Entertainment Inc. was the LAUREL PREMISES, and the resident agent was **Dambeley** at the BELTSVILLE PREMISES. Also like Ravine's Logistic, Global Records Entertainment Inc. is no longer in good standing.

    ii. According to bank records, JPMC 0797 was opened on or about September 18, 2020, by **Dambeley**, with the BELTSVILLE PREMISES as the account address. **Dambeley**—*i.e.*, **KANTE**—was the sole signatory on the account. The account was opened at a JPMC branch located in Kensington, Maryland.

    iii. On or about October 16, 2020, a $48,000 check was deposited into JPMC 0797. The check was payable to "Global Records Entertainment Inc.," drawn on an account held in the name of "Ravine's Logistic Inc." at PNC Bank, and signed by "Ibraham **Dambeley**." On the face of the check, the LAUREL PREMISES address was handwritten below "Ravine's Logistics Inc." Investigators believe that **KANTE** subsequently spent the $48,000 deposited into JPMC 0797 through checks payable to **Dambeley** (*i.e.*, **KANTE**), personal expenditures, and ATM withdrawals.

      d.      On or about March 18, 2021, **KANTE** made a second wire transfer from BA 2315 to JPMC 0797 in the amount of $78,054.  The wire transfer notes referenced "Others Commission on gold sold and brok [sic]".

      i.      Agents believe that, between March 18 and March 31, 2021, **KANTE** used the $156,108 in total that he had wired from BA 2315 to JPMC 0797 on March 18, 2021, for the following expenditures: a $5,000 Western Union transfer to **KANTE**'s brother in Monrovia, Liberia; a $3,000 cashier's check made payable to Individual 2; and personal expenses, including charges at Best Buy, Chick-Fil-A, CVS, Home Depot, and Popeyes.[11]

      ii.      Agents also believe that **KANTE** conducted two cash withdrawals from JPMC 0797 on March 17 and March 19, 2021, respectively.  Each withdrawal was for $3,000 and was conducted at a JPMC branch located in College Park, Maryland.

      e.      Between on or about March 17 and March 22, 2021, **KANTE** also transferred a total of $75,000 from BA 2315 to another Bank of America account held in the name of "Haastrup Transportation."

30.      **KANTE** then used the remaining balance of the above-referenced March 16, 2021, transfer of $570,000 from Individual 1 to BA 2315 to fund cash withdrawals, a $3,000 check payable to Individual 2 with memo "Financial Retainer Payment," outbound wire transfers through Western Union and Ria Financial, and personal expenses.

31.      Ria Financial records, in turn, revealed that "Ibraham **Dambeley**"—*i.e.*, **KANTE**—sent four wire transfers to three individuals shortly after receiving the BEC proceeds in

---

[11] On or about April 26, 2021, JPMC 0797 received a wire transfer in the amount of $49,970 from the above-referenced Royal Gold International Inc. account at Guaranty Trust Bank in Liberia.  The wire transfer notes referenced "Others Commission on gold sold and brok[sic]".  Agents believe that **KANTE** thereafter used the funds for cash withdrawals and personal expenditures.

BA 2315. The wire transfers, which **KANTE** sent between on or about March 19 and March 23, 2021, totaled $10,300. Two of the transactions occurred electronically, and two of the transactions occurred at branch locations in Maryland.

      a.    The two electronic transactions listed the BELTSVILLE PREMISES as the "Sender Address", while the two branch transfers listed the Sender's Address as an address in North Las Vegas, Nevada, which was the same address found on the above-described fraudulent Nevada driver's license that was issued in the name of Ibraham **Dambeley** but displayed a photograph of **KANTE**.

      b.    The $10,300 in wire transfers were sent to three **KANTE** associates in Liberia and Sierra Leone.

32.    By on or about April 1, 2021, the balance in BA 2315 stood at $489.18, and the account conducted minimal financial activity thereafter.

33.    Bank records revealed that online banking activity in BA 2315 was conducted through username "ravine1981." Records also revealed that internet protocol ("IP") address 72.83.111.155 was the most commonly used IP address to access BA 2315 through ravine1981. Of the 956 online events that occurred in BA 2315 between September 7, 2020, and April 12, 2021, 502 of the events were conducted from IP address 72.83.111.155.

34.    Moreover, IP address 72.83.111.155 was used to log into the online account for BA 2315 at around the same time that two of the above-referenced wire transfers were sent from BA 2315 on March 16, 2021: the $150,000 wire to the "Royal Gold International" account at Guaranty Trust Bank and the $53,712 wire to **Dambeley** at Truist Bank

35.    According to records obtained from Verizon FiOS, IP address 72.83.111.155 was assigned to customer "Bass **KANTE**," at the LAUREL PREMISES, with account username

sheikh83 and account email address basskante1983@gmail.com. The account was created on July 15, 2019, and remained active as of at least April 15, 2022.

36.     IP address 72.83.111.155 also was used to access two PayPal accounts that agents believe are controlled by **KANTE**. The first account was assigned to "Ibraham **Dambeley**" at email address sbkfoodreliefproject@gmail.com, business name Global Records Entertainment Inc., with the 8286 Phone Number (the same phone number on the above-referenced Ravine's Logistic invoice), and with BELTSVILLE PREMISES as the account address.[12] The second PayPal account was assigned to Sheikh Bassirou **KANTE** at email address ibrahamdambeley@gmail.com, business name "Royal Oasis Travel Inc.," and the 8286 Phone Number. Both the BELTSVILLE PREMISES and LAUREL PREMISES were listed as account addresses and the IP address 72.83.111.155 was used to access the account as recently as September 2021.

### The BEC at Company D

37.     A second BEC fraud involving **KANTE** related to an intrusion in the personal email account used by Employee 2, a broker with Company D, a real estate agency in Ohio.

38.     At some point before on or about September 21, 2021, an unknown perpetrator gained access to Employee 2's account. Agents believe that, through this unauthorized access, the perpetrator observed details relating to an upcoming closing for a condominium being purchased by Employee 2's client. The perpetrator then spoofed the email domain for the title company facilitating the transaction. Using an email address associated with the spoofed domain, the perpetrator emailed Employee 2 and directed Employee 2 to "notify" Employee 2's client that the

---

[12] According to records provided by Google, IP address 72.83.111.155 also was used to access sbkfoodreliefproject@gmail.com, for which the account recovery email address was basskante1983@gmail.com.

title company's bank account information had changed. The perpetrator advised Employee 2 to direct Employee 2's client to make future payments to JPMC 0797, the same account referenced above, which **KANTE** had opened in the name of "Global Records Entertainment Inc." Employee 2 complied with the perpetrator's instructions and informed Employee 2's client of the account change on or about September 20, 2021. On or about September 21, 2021, Employee 2's client wired a down payment on the condominium, totaling $83,818.41, to JPMC 0797.

39. After receiving Employee 2's client's misdirected down payment, **KANTE** rapidly depleted the funds through the following cash withdrawals: a $45,000 cashier's check made payable to "Ravine's Logistic"; a $10,000 cashier's check made payable to "**Dambeley**"; and credit card purchases in Liberia, Dubai, Washington Dulles Airport, and Laurel, Maryland. By the end of September 2021, the balance in JPMC 0797 stood at $35.66.

## CONCLUSION

40. Based on the information set forth above, I submit there is probable cause to believe that **KANTE** has committed the TARGET OFFENSE. Therefore, I request that the Court issued the proposed criminal complaint and warrant for **KANTE**'s arrest.

Respectfully submitted,

JASON SCALZO
Digitally signed by JASON SCALZO
Date: 2022.04.19 08:59:05 -04'00'

Jason J. Scalzo, Special Agent
FDIC-OIG

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this __19th__ day of April, 2022.

HONORABLE TIMOTHY J. SULLIVAN
UNITED STATES MAGISTRATE JUDGE