IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No. 22-mj-1199-TJS |
| | * | |
| SHEIKH BASSIROU KANTE, | * | |
| | * | |
| Defendant | * | |
| | * | |
| ******* | | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
### FOR REVIEW OF DETENTION ORDER

The United States of America, by and through its undersigned attorneys, respectfully submits this Opposition to the Defendant's Motion for Review of Detention Order, *see* ECF 19. For the reasons described below, this Court should deny the Motion and affirm U.S. Magistrate Judge Timothy J. Sullivan's decision ordering the Defendant to be detained pending trial.

**I.     BACKGROUND**

On April 19, 2022, Judge Sullivan issued an arrest warrant based on a Criminal Complaint charging the Defendant, Sheikh Bassirou Kante, with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).  *See* Criminal Complaint, ECF 1 (attached hereto as **Exhibit 1**).  On April 20, 2022, the Defendant was arrested at his home, mere hours before the Defendant was scheduled to depart on a one-way ticket from Dulles International Airport to Dubai.  The Defendant made his initial appearance before Judge Sullivan later that day, and Judge Sullivan ordered the Defendant temporarily detained pending a detention hearing.  *See* ECF 8.

Judge Sullivan held the Defendant's detention hearing on April 22, 2022.  *See* ECF 15. At the hearing, Judge Sullivan considered the report from Pretrial Services recommending that the Defendant be detained pending trial.  *See* Pretrial Services Report.  After then hearing argument from the parties and considering the factors in 18 U.S.C. § 3142(g), Judge Sullivan concluded that

1

the government had established by a preponderance of the evidence that no condition or combination of release conditions could reasonably assure the Defendant's appearance in court as required. *See* Order of Detention, ECF 16. In a written Order, Judge Sullivan found that: (1) the weight of the evidence against the Defendant was strong, (2) the Defendant was subject to a lengthy period of incarceration if convicted, (3) the Defendant had significant family or other ties outside the United States, (4) the Defendant was subject to removal or deportation after serving any period of incarceration, (5) the Defendant had used alias(es) or false documents, and (6) the Defendant's background information was unverified. Judge Sullivan further emphasized that (7) the Defendant possessed multiple passports from various countries as well as fraudulent identification documents, (8) the Defendant had traveled internationally with "great frequency," (9) the Defendant had unexplained assets and sources of large amounts of money, and (10) the Defendant had close ties to foreign governments—in particular, the government of Liberia. *See id.* at 2–3. Accordingly, Judge Sullivan determined that the Defendant was "a serious risk of flight" and ordered the Defendant to be detained pending trial. *See id.*

On April 29, 2022, the Defendant filed the instant Motion for Review of Detention Order. *See* ECF 19. Because Judge Sullivan correctly concluded that the Defendant must be detained pending trial, the Defendant's Motion should be denied.

## II. ARGUMENT

As the government established by a preponderance of the evidence at the hearing before Judge Sullivan, there are no conditions or combinations of conditions that will reasonably assure the appearance of the Defendant as required. Nor does the Defendant identify any information that undermines such a finding. Accordingly, the Court should affirm Judge Sullivan's order detaining the Defendant pending trial.

A.     **<u>Legal Standard</u>**

Under 18 U.S.C. § 3145(a), this Court conducts a *de novo* review of Judge Sullivan's detention order pursuant to § 3142. *See United States v. Clark*, 865 F.2d 1433, 1436–38 (4th Cir. 1989); *United States v. Williams*, 753 F.2d 329, 331–34 (4th Cir. 1985); *see also United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001) ("When the district court acts on a motion to revoke or amend a magistrate judge's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release."). Section 3142 provides, in relevant part, that, if a judicial officer finds—after a hearing—that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer *shall* order the detention of the person before trial." 18 U.S.C. § 3142(e)(1) (emphasis added). In evaluating the risks of danger and nonappearance, the statute directs courts to consider: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence against the person," (3) "the history and characteristics of the person," and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Although a court's finding of dangerousness requires proof by clear and convincing evidence, *see* § 3142(f)(2), the government need only establish the risk of nonappearance by a *preponderance* of the evidence. *See, e.g.*, *United States v. Portes*, 786 F.2d 758, 764–65 (7th Cir. 1985); *United States v. Davis*, 449 F. Supp. 3d 532, 534 (D. Md. 2020).[1] That burden is easily met here.

---

[1] The Federal Rules of Evidence do not apply at a detention hearing, *see* Fed. R. Evid. 1101(d)(3), and the parties may proceed via attorney proffer, *see, e.g.*, *United States v. White*, Crim. No. PWG-13-0436, 2015 WL 2374229, at *2 (D. Md. May 15, 2015).

## B. Section 3142(g) Analysis

The Defendant is a self-proclaimed "international businessman" who is alleged to have laundered and then spent more than $600,000 in fraud proceeds using shell companies, a fake name, a fake social security number, and international wire transfers. The Defendant has an extensive history of foreign travel and maintains deep ties abroad, including to children, businesses, and the head of a foreign government. The Defendant has unexplained wealth and significant assets overseas. And the Defendant was arrested just hours before he was scheduled to take a one-way flight to Dubai. Judge Sullivan's finding that the § 3142(g) analysis required the Defendant's pretrial detention based on risk of flight was eminently correct.

### 1. Nature and Circumstances of the Offense

The Defendant is charged with a very serious offense, the details of which are described in the Criminal Complaint, *see* Exh. 1, and an affidavit in support of applications for multiple search warrants that were executed in conjunction with the Defendant's arrest, *see* Affidavit (attached hereto as **Exhibit 2**). In short, the Defendant laundered hundreds of thousands of dollars that was stolen from victims through two business email compromise ("BEC") schemes. Each time, moreover, the Defendant depleted the funds that he laundered within weeks of receiving them.

First, in or about March 2021, the Defendant received approximately $570,000 in funds that a health insurance company in Washington intended to pay to a healthcare provider in Alaska. The Defendant then laundered the diverted funds through an account held in the name of "Ravine's Logistic, Inc.", a business that is not in good standing with the State of Maryland and was registered to the Defendant's alias, "Ibraham Dambeley," at the Defendant's mother's residence.

Second, in or about September 2021, the Defendant received approximately $84,000 that an individual victim intended to send to a title company as down payment for a condominium. The Defendant then laundered the diverted funds through an account held in the name of "Global

4

Records Entertainment Inc," a business that—like Ravine's Logistic, Inc.—is not in good standing and was registered to "Ibraham Dambeley" at the Defendant's mother's residence.

Accordingly, the Defendant has been charged in the above-described Criminal Complaint with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). The Defendant faces a maximum term of 20 years' imprisonment and a more-than $1.2 million fine (twice the amount of funds involved in the conspiracy). By the government's calculation, the Defendant faces a post-trial guidelines range of 64 to 78 months' imprisonment (based on offense-level enhancements for loss amount, conduct under § 1956, and sophisticated means). As Judge Sullivan noted, this is a significant penalty for a defendant who has no criminal history and who claimed at the detention hearing to be an "international businessman" with monthly travel to Dubai and other locations in Africa and the Middle East. Consequently, the penalties alone provide the Defendant with a strong incentive to flee from prosecution.

Aside from the potential penalties, the Defendant's risk of nonappearance is driven by several other features of the Defendant's offense. As mentioned, the Defendant used a fake identity—specifically, "Ibraham Dambeley"—and illegitimate business entities to launder the stolen funds.[2] Soon after the Defendant received the laundered funds, the Defendant quickly depleted the funds almost entirely—including several times through *international* wire transfers. For instance, on or about March 16, 2021, the Defendant transferred $150,000 to an account held in the name "Royal Gold International" at Guaranty Trust Bank, a Nigerian bank. On or about March 18, 2021, the Defendant transferred an additional roughly $104,000 to the above-referenced

---

[2] As described in the Complaint and search warrant affidavit, the execution of search warrants on email accounts associated with the Defendant revealed an email dated on or about March 25, 2021, with a subject line "Heheh," and an attachment containing an image of a Nevada driver's license purportedly issued to "Ibraham Dambeley," but displaying a photo of the Defendant. Agents later determined that this Nevada driver's license has never been issued and was, in fact, a false identification document.

Royal Gold International account at Guaranty Trust Bank.[3] And, between on or about March 18 and March 21, 2021, the Defendant transferred $5,000 to his brother in Monrovia, Liberia, and sent another $10,300 in wire transfers to three of the Defendant's business associates in Liberia and Sierra Leone. Similarly, after the Defendant received the misdirected condominium down payment on or about September 21, 2021, the Defendant rapidly depleted the funds through the following cash withdrawals: a $45,000 cashier's check made payable to "Ravine's Logistic"; a $10,000 cashier's check made payable to "Dambeley"; and more than $30,000 in credit card purchases in Maryland, Dulles International Airport, Liberia, and Dubai.

In sum, the risk of nonappearance is plainly aggravated by the nature and circumstances of the Defendant's offense.

### 2. Weight of the Evidence

The weight of the evidence further heightens the risk of nonappearance. The government's evidence in this case is, as Judge Sullivan observed, "extremely strong." As set forth in the Complaint and search warrant affidavit, the evidence includes detailed reporting from victims on the original purpose of the funds and the manner in which the funds were stolen. The evidence also includes, in Judge Sullivan's words, "cold documents" not subject to reasonable dispute. These documents include bank statements, tax records, business filings, email files, and internet protocol ("IP") data. The email accounts, in turn, link the Defendant to the fake business accounts, the fake Dambeley identity, and to the intermediary who laundered the stolen funds before the Defendant received them. The IP records, moreover, establish that certain laundering

---

[3] On or about April 26, 2021, the Defendant *received* an international wire transfer in the amount of $49,970 from the Royal Gold International Inc. account at Guaranty Trust Bank. The wire transfer notes referenced "Others Commission on gold sold and brok[sic]". Agents believe that the Defendant thereafter used the funds for cash withdrawals and personal expenditures.

6

transactions involving the stolen funds were conducted using the Defendant's online banking account through the Defendant's own home internet connection.

In addition to the information alleged in the Complaint and search warrant affidavit, the evidence against the Defendant also includes documents and statements obtained by the government during the execution of search and arrest warrants on April 20, 2022. Specifically, the search of the Defendant's residence yielded bank records and numerous fraudulent identity documents and access devices, including: five California driver's licenses all in the names of various aliases; two fake Social Security cards; and multiple credit cards in alias names. *See* Apr. 20, 2022, Photographs (attached hereto as **Exhibit 3**) at 2–4. Moreover, in a trash bin, agents located a fake Ghanaian passport issued to "Ibraham Dambeley" and the fake Nevada driver's license issued to "Ibraham Dambeley," an image of which had previously been located in an email account associated with the Defendant. *See id.* at 5.[4]

After being advised of and waiving his *Miranda* rights, the Defendant also made several relevant post-arrest statements to agents who were present during the search. Initially, the Defendant denied using identities other than "Sheikh Bassirou Kante." After being confronted with contrary evidence, however, the Defendant admitted to using the name Ibraham Dambeley. When he was asked why the Dambeley documents had been found in the trash, the Defendant stated that he did not need them anymore, but did not explain why he happened to reach this decision close in time to the search and arrest operation. The Defendant also acknowledged having foreign contacts and making numerous trips abroad.

The Defendant insisted that the more than $600,000 that he received through the above-described BEC frauds represented money relating to deals in gold that had gone wrong. This

---

[4] Agents also seized approximately 12 devices, including laptops and cellphones, which are presently being reviewed for evidence of the Defendant's offense.

7

explanation was not credible. First, the Defendant could not explain why, if the deals had failed to pass, the Defendant never returned the money and, instead, spent it. Second, to the extent the money was legitimate, the Defendant never reported it as legitimate income to the State of Maryland. Third, the Defendant would have no reason to use a fake identity to launder the funds if the deals were legitimate. Fourth, the entities the Defendants used to launder the funds—Ravine's Logistics and Global Records Entertainment—were not in good standing and had no ostensible connection to the gold trade. Fifth, the intermediary from whom the Defendant initially received the funds is not—and did not purport to be—involved with trading gold. Sixth, certain transactions affirmatively undermine the Defendant's claim that the money related to transactions in gold; the Defendant used laundered funds to pay: (a) $75,000 to "Haastrup Transport" for unspecified purposes, (b) $78,000 to Global Records Entertainment for "Sounds and Lighting Equipment," (c) $45,000 to Ravine's Logistics, and (d) $10,000 to "Dambeley." Seventh, agents traced tens of thousands of dollars in laundered funds to the Defendant's purchase of a 2021 Range Rover, which was parked in the Defendant's garage at the time of his arrest.

### 3. Defendant's History and Characteristics

The Defendant's history and characteristics also weigh heavily in favor of affirming Judge Sullivan's order detaining the Defendant pending trial.

#### a. Employment

The Defendant told Pretrial Services that he was self-employed, that his business generated between "$100,000 and $5,000,000 per year depending on the market," and that he earned $500,000 in 2021. *See* Pretrial Services Report at 2. The Defendant also claimed to have $150,000 in his business and personal checking accounts. *See id.* But there is no evidence that the Defendant has any legitimate business income. Insofar as the Defendant has earned this income abroad, he has not reported his foreign income (or his foreign bank accounts, as required

8

by law) to the U.S. government. To the extent the Defendant earned this income domestically, he has *never* reported *any* income to the State of Maryland. And, while the Defendant has filed federal income tax returns in the past, these returns are wildly inconsistent with the income the Defendant reported to Pretrial Services. In 2020, the Defendant declared a $26,000 loss for 2019; and in 2019, he declared $75,000 loss for 2018.

The income the Defendant did report to Pretrial Services is also inconsistent with the Defendant's reports to other sources. To get a loan with Maserati, the Defendant claimed his annual income was $325,000. In connection with his Land Rover purchase, the Defendant claimed it was $180,000. And, when he (successfully) applied for a $20,375 PPP loan in or about 2020, the Defendant represented that he was an accountant who earned $80,000 per year. More recently, the Defendant went under contract to purchase a newly built custom home in Glen Burnie, Maryland. To obtain a loan for this home, the Defendant sent his creditor a screenshot showing that he had access to a bank account in the United Arab Emirates that had a balance of $12.6 million Emirati Dirhams, or approximately $3.4 million U.S. dollars. *See* Exh. 3 at 6. And the Defendant did not even disclose this loan (or the asset) to Pretrial Services. *See* Pretrial Services Report at 2.

Thus, as Judge Sullivan observed, the Defendant has substantial unexplained income and significant foreign wealth (to which the U.S. government has limited insight and access). Accordingly, the Defendant is capable of hiding his assets from the Court and has the means to maintain his lifestyle abroad. Even if the Defendant has depleted his foreign assets, the Defendant also claimed at his detention hearing that he runs businesses in Africa and the Middle East. The Defendant, therefore, has the means to live outside the United States and has powerful financial incentives to flee. These factors significantly enhance the Defendant's risk of nonappearance.

b. <u>Family Ties</u>

Nor does the Defendant have any family ties that mitigate this risk. The Defendant proposed his mother as a third-party custodian and claimed that he speaks to his mother daily. See Pretrial Services Report at 1. But the Defendant's mother told Pretrial Services that she was "unaware" of the Defendant's "financial and travel information, as well as the nature of his self-employment." See Addendum to Pretrial Services Report at 1. Accordingly, as Judge Sullivan observed, the Defendant's mother is not a suitable third-party custodian. *See, e.g.*, *United States v. England*, Crim. No. RDB-20-75, 2020 WL 3316340, at *1 (D. Md. June 18, 2020) (reiterating finding that defendant's girlfriend was not suitable TPC where defendant "was living with her when he allegedly committed these crimes, and the nature of their relationship does not reasonably assure me that she would report violations of release conditions"); *United States v. Davis*, 2013 WL 6094445, at *7 (W.D. Pa. Nov. 20, 2013) (questioning proposed TPC's suitability when defendant's criminal conduct occurred while defendant was living with proposed TPC "which indicates that defendant successfully hid such criminal activity from her").

Not only do the Defendant's family ties fail to mitigate his risk of nonappearance, his ties, in fact, exacerbate it. Specifically, the Defendant's brother—to whom the Defendant sent a portion of the laundered funds—lives in Liberia. And the Defendant told U.S. Citizenship and Immigration Services ("USCIS") that he has children living in Africa with their mothers: one in Liberia and one in Morocco. But the Defendant failed to disclose any of these family ties to Pretrial Services. Disclosure failures like these underscore that the Court cannot trust the Defendant with pretrial release.

c. <u>Length of Residence / Community Ties</u>

Despite claiming to live in United States since 2001, the Defendant disclosed zero *community* ties in the State of Maryland. The Defendant has no employees here and did not

report participating in any civic, business, volunteer, or religious organizations in Maryland. By contrast, the evidence in the complaint, the search warrant affidavit, and the Defendant's own representations at the detention hearing indicate that the Defendant has substantial ties to multiple foreign countries. And the Defendant holds himself out as an "international businessman" who owns businesses in Sierra Leone, Liberia, and Dubai, and that his involvement with these purported enterprises requires *monthly* foreign travel. In short, not only are there few forces pulling the Defendant back to the United States, but there are significant forces that push him abroad.

The Defendant's ties to Liberia, moreover, are especially deep. The email search warrant production revealed that the Defendant has a close personal relationship with the Vice President of Liberia. Moreover, during the execution of the search warrant at the Defendant's residence on April 20, 2022, agents discovered that the Defendant was in possession of a *Diplomatic* Liberian passport. *See* Exh. 3 at 7. That the Defendant, who occupies no formal diplomatic position within the Liberian government (a fact the Defendant admitted at the detention hearing), was nonetheless in possession of a Diplomatic Liberian passport is powerful evidence of the strength of the Defendant's connections to the highest levels of the Liberian government. The Defendant is, after all, a citizen of Liberia, not the United States. A connection like this, therefore, only enhances the Defendant's already elevated risk of nonappearance.

d. <u>Past Conduct</u>

Even absent the criminal conduct alleged in this case, the Defendant's past conduct is especially significant in the § 3142(g) analysis. As discussed, the Defendant already has a strong financial incentive to flee the United States. Indeed, the Defendant disclosed to Pretrial Services that he travels monthly to Dubai and Liberia for his livelihood. But this disclosure understates the extent of the Defendant's foreign travel and contacts. The Defendant—presently a lawful permanent resident—recently filed an Application for Naturalization through USCIS Form N-400.

11

In a supplemental submission dated February 4, 2021, the Defendant disclosed that he had traveled outside the United States approximately 40 times in the three-year period between December 2017 and January 2021. *See* Form N-400, *List of International Travel* (attached hereto as **Exhibit 4**).[5] While the Defendant claimed that many of these trips were for "business" or "personal" reasons, the Defendant alleged that he could not recall the purpose or destination of approximately 20 of these trips. *See id.* To the extent the Defendant *could* recall where he traveled abroad, the Defendant reported that his business and personal trips included destinations located throughout Africa and the Middle East, including Egypt, the United Arab Emirates (Dubai), Ghana, Mali, Liberia, Israel, Kuwait, and Sierra Leone. *See id.* The Defendant's frequent foreign travel only bolsters the conclusion—based on the Defendant's alleged international business work and relationship with a foreign government—that the Defendant has significant foreign ties.

The Defendant's foreign travel, moreover, did not end in January 2021. As recently as March 2022, the Defendant was screened upon his return to Dulles on an international flight. The Defendant was carrying $2,000 in U.S. currency and plans for purchasing a property in Dubai worth approximately $875,000. The Defendant told an agent with U.S. Customs and Border Protection that he was returning from Dubai (where he was purportedly trading minerals) and Ghana (where he was purportedly trading gold). The Defendant added that he travels one or two weeks per month for business and stated that he would soon return to Ghana. When the Defendant was arrested on April 20, 2022, however, the Defendant was just a few hours away from boarding a one-way flight to Dubai.

---

[5] The Defendant also falsely represented that he had only ever used two names (Sheikh Bassirou Kante and Bass Kante) and one Social Security Number. As the search warrant affidavit describes, this representation was false because, in August and September 2020, the Defendant used the alias "Ibraham Dambeley" and a fake social security number to open bank accounts used to launder BEC fraud proceeds. Because these false representations, moreover, are material to USCIS's decisionmaking process, the Defendant has likely violated 18 U.S.C. § 1546.

In sum, the Defendant has family and business abroad, deep ties to the highest level of a foreign government, access to foreign wealth, and the means and intent to reside abroad. This was ample evidence to support Judge Sullivan's preponderance finding.[6]

### 4. Nature and Seriousness of Danger Posed by the Defendant's Release

While the government seeks the Defendant's pretrial detention based on the risk of nonappearance, the Court should nonetheless consider the risk of public danger in the § 3142(g) analysis. If released, there is a serious risk that the Defendant will engage in future criminal conduct of a similar nature, risking further economic harm to the public. And federal courts, including courts in this district, have recognized that economic harm is a type of danger to the community to be considered in the pretrial detention analysis. *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Cohen*, Crim. No. WDQ-14-310 (D. Md. Oct. 16, 2014), ECF 39 (holding that dangerousness can properly be considered under § 3142 when government has basis to seek detention based on risk of nonappearance); *United States v. Madoff*, 586 F. Supp. 2d 240 (S.D.N.Y. Jan. 12, 2009) (noting "support for considering economic harm in evaluating danger to the community under Section 3142").

First, the Defendant's conduct was not a one-time occurrence. As alleged in the Complaint, the Defendant laundered (and spent) the proceeds of two separate BEC schemes—one in March 2021 and the other in September 2021. Significantly, one of the Defendant's victims was an individual person who lost more than $80,000—a sum that was intended as a down payment

---

[6] Indeed, the government's notes reflect that, at the end of the detention hearing, the Defendant shouted out (quite incredibly) that he would not be available for the preliminary hearing—originally scheduled for May 6, 2022—because the Defendant had foreign travel planned. This outburst undermines any suggestion that the Defendant will agree to abide by travel restrictions now that he has been charged with a serious federal criminal offense.

for a residence.  Second, while cybercrime is—as a general matter—a widespread ongoing threat, the specific threat of future harm to the Defendant's corporate victim is not abstract.  Since the initial BEC occurred in March 2021, there have been multiple additional attempted computer intrusions at the company, including one as recent as March 2022.  And this type of cybercrime is fueled by money launderers like the Defendant, who make it easier to hide criminal proceeds.

Third, there is no evidence that the Defendant would have discontinued his money laundering activities absent his arrest.  To the contrary, the Defendant had registered a new shell company ("Ravine's Logist.") with the State of Maryland in March 2022.  And the week before his arrest, the Defendant had opened a new bank account in the name of this shell company with a $25,000 cashier's check of unknown origin.  In any event, there is no reason to believe that home detention would deter such conduct.  All of the Defendant's criminal conduct in this case—communicating with co-conspirators, setting up shell companies, arranging financial transactions, conducting international wire transfers, and converting crime proceeds to his own use—can be conducted (indeed, in this case, *was* primarily conducted) from inside his residence.  There are no conditions of release that could mitigate the risk of the Defendant resuming any of this conduct from home detention.  *See, e.g.*, *United States v. Nelson*, No. 20-CR-00038-DKC, 2020 WL 2097693, at *8 (D. Md. May 1, 2020) ("Even if a suitable third-party custodian made a good-faith effort to enforce these restrictions, it would not be difficult for the defendant to circumvent them.  For example, the defendant could obtain a laptop computer, cell phone, iPad, or other electronic device without the knowledge of the third-party custodian.").

In any event, the Court cannot ignore the substantial risk of flight—especially now that the Defendant is facing a lengthy jail sentence.  Even though the government has taken possession of the Defendant's passports, as the Defendant points out, the Defendant is personal friends with the Vice President of Liberia.  The Court has no ability to prevent Liberian officials from issuing the

Defendant a new passport, and no way of monitoring the Defendant's attempts to obtain one. Moreover, the evidence seized from the Defendant's residence and email account demonstrates that the Defendant has the ability to obtain false identification and travel documents on his own. No release conditions are capable of preventing the Defendant from obtaining new fraudulent identification and travel documents—especially when the government has not yet identified the Defendant's source. Nor can the Court trust the Defendant to abide by any release conditions when, notwithstanding Judge Sullivan's detention order, the Defendant claimed that he could not be present at his preliminary hearing due to his upcoming travel.

The Defendant suggests that pretrial release is nonetheless warranted because "the Government's objections to the Defendant's release are in part the product of the Government's action in this case." ECF 19 ¶ 4. The Defendant is incorrect, for multiple reasons. █████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████

      ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

### III. <u>CONCLUSION</u>

Accordingly, for the foregoing reasons, the government has demonstrated beyond a preponderance of the evidence that no condition or combination of conditions will reasonably assure the Defendant's appearance as required. Accordingly, the Court should deny the Defendant's motion and affirm Judge Sullivan's Order of Detention pending trial.

                                              Respectfully Submitted,

                                              Erek L. Barron
                                              United States Attorney

By:       /s/                
          Jeffrey J. Izant
          Assistant United States Attorney

          John M. Blumenschein
          Special Assistant United States Attorney